**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |  | |
|---|---|---|---|
| **JIMMIE LEE THOMAS,** | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | No. 09 C 1219 | |
| v. | ) | | |
| | ) | | |
| **MICHAEL J. ASTRUE,** | ) | Magistrate Judge Michael T. Mason | |
| **Commissioner of Social Security,** | ) | | |
| | ) | | |
| Defendant. | ) | | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Jimmie Lee Thomas ("Thomas" or "Claimant") brings this motion for summary judgment [21] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Thomas' claim for disability insurance benefits under Sections 216 and 223 of the Social Security Act (the "SSA"), 42 U.S.C. §§ 416(I) and 423(d), and his claim for supplemental security income under Section 1614(a)(3)(A) of the SSA, 42 U.S.C. § 1382a(a)(3)(A). The Commissioner filed a cross-motion for summary judgment [29], requesting that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, Claimant's motion for summary judgment [21] is granted and the Commissioner's cross-motion for summary judgment [29] is denied.

**I.     BACKGROUND**

   **A.     Procedural History**

On March 2, 2005, Thomas filed applications for period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging an onset of disability of March 3, 2005.  (R. 14, 45).  His date last insured was December 31, 2006.  (R. 47).  The Social Security Administration initially denied his claims on April 27, 2005, and upon reconsideration on July 15, 2005.  (R. 45).  Thomas filed a timely request for a hearing on August 4, 2005.  (*Id.*).  On February 19, 2008, Thomas appeared with counsel before Administrative Law Judge ("ALJ") E. James Gildea.  (R. 13).  On August 7, 2008, ALJ Gildea issued a written decision denying Thomas' request for benefits.  (R. 45-53).  Thomas filed a timely Request for Review, and on January 23, 2009, the Appeals Council denied this request, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-3); *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998); 20 C.F.R. § 416.1481.  Thomas subsequently filed this action in the District Court.

   **B.     Medical Evidence**

Claimant seeks DIB and SSI for disabling conditions stemming from liver disease, kidney disease, rheumatoid arthritis, gout, and high blood pressure (hypertension).  (R. 29, 50-51,119).

      **1.     Cook County Hospital**

Thomas' medical records date back to April of 1997, when he was treated at Cook County Hospital.  Although several of these records are illegible, it appears that

Thomas was treated in the Trauma Unit on April 12, 1997. (R. 223-225). Thomas then had a follow up visit on April 24, 1997, and the treating physician noted that Thomas suffered from alcohol abuse, peptic ulcer disease ("PUD"), blunt facial trauma, and gastrointestinal bleeding. (R. 217). On March 12, 1998, Thomas was again treated at Cook County Hospital. The treating physician again noted Thomas' alcohol abuse, blunt facial trauma, PUD and gastrointestinal bleeding. (R. 215). On April 20, 1998, Thomas was treated for a cough and fever, and at this visit, he was diagnosed with alcoholic hepatitis, hypertension and PUD. (R. 211).

Thomas returned to Cook County Hospital on March 19, 1999 for a refill of his medications. (R. 212-214). The treating physician noted that Thomas suffered from abdominal pain due to a fatty liver, alcoholic liver disease, PUD and hypertension. (*Id.*). These notes also indicate that Thomas reported that he had not been consuming as much alcohol as he had in the past. (*Id.*).

A progress report dated October 22, 1999 notes that Thomas had been recently released from the hospital for nose bleeding but there were no signs of bleeding ulcers. (R. 210). This report also notes that Thomas suffers from alcohol abuse, that he had his last drink two weeks ago, and that "he promises not to drink anymore." (*Id.*). On November 24, 1999, Thomas was treated in the emergency room, complaining of pain, headaches, dizziness and bleeding. (R. 226-28).

### 2. River Region Medical Center

On December 4, 2004, Thomas was treated at the River Region Medical Center in Vicksburg, Mississippi. He complained of pain and swelling in his right foot and

ankle. (R. 239-240). The records indicate that Thomas' pain had been on-going for two days and that it was the result of "standing a lot at work." (R. 239). Thomas reported that the pain was moderate, exacerbated by movement, and that he was not able to find anything to relieve the pain. (*Id.*). Dr. Kristen Coleman reviewed an x-ray of Thomas' right ankle and saw no evidence of acute traumatic injury. (R. 242). Thomas was released with a prescription for the pain. (R. 241).

### 3. River Region Health System, The Street Clinic

Thomas was also treated at The Street Clinic (part of the River Region Health System) in Vicksburg, Mississippi between February, 2005 and June, 2006. On February 11, 2005, Thomas saw Dr. Robert A. Williams and complained of pain in his neck, abdomen, right hand and right leg. (R. 194-95). Dr. Williams noted that Thomas "is mildly inebriated and admits to drinking before coming in to the office this morning." (*Id.*). Dr. Williams ordered a CT scan of Thomas' abdomen and tests to evaluate liver function, splenic, and kidney functions. (*Id.*). Dr. Williams also noted that Thomas "is an apparent heavy drinker, has been for many years." (*Id.*). Dr. Williams stated that Thomas said he can consume "as much as a pint of Vodka a day, sometimes more." Dr. Williams wanted to address the alcohol abuse on future visits. (*Id.*).

A radiology report dated February 14, 2005 showed bilateral renal cysts in his kidneys and "mild diffuse low attenuation, consistent with fatty infiltration." (R. 196). On February 17, 2005, Thomas returned to Dr. Williams, complaining of swelling in his foot and hands. (R. 193). Dr. Williams noted that the "patient has been drinking." (*Id.*). Dr. Williams also noted "he wants disability for gout in hands and feet." (*Id.*).

Thomas had a follow-up appointment with Dr. Williams on March 8, 2005. Dr.

Williams noted that Thomas "says that right now he is not able to work because it hurts in his head and stomach." (R. 192). Claimant told Dr. Williams that he missed an appointment with another doctor for an esophagogastroduodenoscopy ("EGD") because of his work schedule. (*Id.*). Thomas asked Dr. Williams for another prescription for the pain because "his sister threw his last prescription for the pain medicine away." (*Id.*). Dr. Williams' assessment of Thomas' lab work showed that he "has liver abnormalities, possibly cirrhosis superimposed on hepatitis C." (*Id.*). In order to further assess the liver problems, Dr. Williams referred him again for an EGD. (*Id.*). Thomas' lab work also was positive for rheumatoid arthritis. (*Id.*). Dr. Williams prescribed a medrol dose pack for relief. (*Id.*). Dr. Williams' report states that Thomas should continue to treat his gout symptomatically, and that "his uric acid level was in the high normal range." (*Id.*).

Thomas followed up with Dr. Williams on March 30, 2005. (R. 201). He complained of pain in his right hand and leg. (*Id.*). Dr. Williams proscribed several medications for Claimant's rheumatoid arthritis, including Prednisone and Celebrex. (*Id.*).

During a May 2, 2005 follow-up appointment with Dr. Williams, Thomas complained of cramping in his right leg but said he was feeling better. (R. 200.) Dr. Williams proscribed Prednisone and Motrin for Claimant's rheumatoid arthritis. (*Id.*). On May 31, 2005, Thomas went to see Dr. Williams to discuss Humira (an injection sometimes proscribed to reduce pain and swelling in rheumatoid arthritis patients).[1] (R. 199). Claimant complained of tenderness, redness and swelling as well as limited range

---

[1] See http://www.humira.com/ra/default.aspx.

of motion in his extremities. (*Id.*).

On June 15, 2006, Thomas was admitted to the hospital where he stayed until June 29, 2006. (R. 258-259). Thomas was diagnosed with "cirrhosis of liver, hepatocellular carcinoma (suspected), hepatitis C, alcoholic neuropathy, hypomagnesemia, thrombocytopenia, bone marrow suppression, chronic alcohol abuse, [and] chronic hypokalemia." (R. 258). Dr. Williams stated that Thomas was admitted "with a history of heavy alcohol abuse, very poor self care, [and] very poor diet." (*Id.*). Upon his discharge, Thomas was prescribed iron, magnesium oxide, potassium chloride, a multivitamin and lyrica. (*Id.*). During his stay, Claimant's abdomen was x-rayed and was found to be unremarkable. (*Id.*) In addition, an ultrasound of his abdomen showed unremarkable liver and gallbladder exams. (*Id.*). An x-ray of his knee was normal while his "left ankle showed mild soft tissue swelling." (*Id.*). Dr. Williams opined that Thomas' abdominal pain "was most likely secondary to his alcohol abuse," and noted that Thomas had "improved over the time that he was here, [and] was discharge[d] in good condition." (*Id.*). Dr. Williams noted that more than two months after discharge, Thomas still had not followed up with his office. (R. 259).

### 4. Oak Forest Hospital of Cook County

Thomas was hospitalized at Oak Forest Hospital from June 23 through June 29, 2007 for severe abdominal pain, hepatitis C, alcoholic liver disease, alcohol withdrawal and renal insufficiency. (R. 269-81). Thomas reported that his abdominal pain was a nine out of ten, and he had been vomiting 3 times a day prior to his admission to the hospital. (R. 270, 279). He also complained of pain in his left lower extremity. (R. 280). An ultrasound showed that Thomas' liver, pancreas, and gallbladder were normal, he

6

had "a small benign cyst" in the left kidney, and his "bowel gas pattern" was unremarkable. (R. 282-286). His chest x-ray was normal with "a few benign small granulomas of both lungs." (R. 287). Thomas was diagnosed with alcohol withdrawal, abdominal pain, alcoholic liver disease, hypertension, hepatitis C, low platelet levels and renal insufficiency. (R. 270, 274, 281). Thomas was given prescriptions for pantoprazole, enalapril, magnesium oxide, atenolol, folic acid, duamine, lorazepam and a nicotine patch for blood pressure and shaking. (R. 271). Thomas' discharge summary includes a section for physical activity limitations - it states "as tolerated." (R. 272). Thomas was instructed to stop consuming alcohol and to monitor his blood pressure. (*Id.*). He was referred to an alcohol treatment program. (*Id.*).

On December 28, 2007, Thomas was again admitted to Oak Forest Hospital, due to alcoholic liver disease, right flank pain, hypotension, fever, chills, and dizziness. (R. 296-304). Thomas reported that his pain started three days prior to his admission and had increased in severity. (R. 302). At the time of admission, he was taking pantoprazole, enalapril, atenolol, folic acid, diphenhydramine, and thiamine. (*Id.*). Thomas was discharged on December 31, 2007 with nine prescriptions. (R. 298). Again, the section of the discharge summary for physical activity limitations states "as tolerated." (R. 299). Thomas was instructed to stop consuming alcohol. (*Id.*). Thomas had a follow-up evaluation on January 14, 2008 and he was referred for hernia surgery for his severe right flank pain. (R. 305-306).

### C.    Claimant's Testimony

Thomas was born on June 11, 1951. (R. 15). At the time of the hearing, he was 5' 6" tall and weighed 145 pounds. (*Id.*). Thomas is a widower with a high school

7

diploma, but no other formal education. (R. 15-16). He lives with his sister in a home that she owns. (*Id.*).

Thomas alleges disability beginning on March 3, 2005. (R. 45). In the ten years prior to his alleged disability, Thomas has held four full-time jobs. Thomas testified that he worked as a security guard for a trucking firm for approximately one year, in 2004. (R. 31, 36). Thomas also said that he worked at a casino as a janitor for approximately a year and half, until February of 2002. (R. 17).[2] Thomas testified that at the casino, he worked five days a week and eight hours a day, and his duties involved mopping the floors. (*Id.*). Prior to his work at the casino, Thomas worked as a janitor at a middle school for approximately a year and a half. (R. 17-18). He also worked seasonally installing bleachers for a construction company off and on for seven years. (R. 18).

Thomas testified that he has been hospitalized three times in the past five years for kidney, back and stomach problems. (R. 20-21). He further testified that he has suffered from back problems for two years. (R. 21). He also stated that he had kidney problems in December 2007. (R. 22). He does not know what is wrong with his kidneys, but at that time, he could not walk or stand upright because of the pain. (R. 21-22). Thomas said that he has suffered from cirrhosis of the liver since 2000, which his doctors told him was the result of his excessive drinking. (R. 23-24). When he was hospitalized in 2006, he was diagnosed with hepatitis C in addition to cirrhosis. (R. 28).

Thomas testified that he began suffering from arthritis in 2002, and that his symptoms worsened in 2005 when he was diagnosed with rheumatoid arthritis. (R. 24).

---

[2] Despite Thomas' testimony, the record demonstrates that Thomas worked as a security guard in 2002 and at the casino from 2/03 to 3/05. (R. 127).

8

He said that the arthritis affects his wrists, knees, and the joints in his foot. (R. 24-25). He also testified that on occasion (twice a month or up to once every two months), he suffers from an episode of gout which lasts about two weeks. (R. 29). During this time, he is unable to walk due to swelling in his right foot and ankle. (*Id.*).

Thomas testified that the swelling in his arms and the aching in his back are the main problems that have prevented him from seeking employment. (R. 28). He stated that he suffers from low energy and is unable to walk for any distance. (R. 29). He claims that even walking slowly for one block is very difficult. (*Id.*). He spends his days watching television and does not go outside for walks or complete any basic household chores. (R. 25-27). Thomas testified that the last time he tried to go outside and take a walk, he passed out. (R. 25). His brother frequently visits him at his home and his niece takes care of his dishes and grocery shopping. (R. 27).

Thomas stated that he is currently seeing Dr. Lopez at Oak Forest Hospital every three months. (R. 20). Thomas also testified that he is currently taking eleven different medications. (R. 19). Although he could not recall the specific drugs, he said that the medications were for blood pressure, arthritis, back pain and stomach pain. (R. 19-20).

Thomas has a history of alcohol abuse. He testified that he stopped drinking on Thanksgiving Day 2007; prior to this, he had been drinking between 1-1.5 pints of brandy per day. (R. 23). Thomas also testified that he has stopped smoking, but that he used to smoke a half of a pack of cigarettes every day. (R. 26).

### D. Vocational Expert's Testimony

Vocational Expert Lee Canutzen ("the VE" or "VE Canutzen") testified at the February 19, 2008 hearing. (R. 30-36). VE Canutzen described Thomas' past work

9

experience as defined by the Dictionary of Occupational Title ("DOT"). (R. 31). The VE classified Thomas' janitorial work at the casino as a kitchen helper and, according to the DOT, that work is unskilled and requires medium exertion. (*Id.*). Next, VE Canutzen looked at Thomas' past position with a lawn service (primarily cutting grass) and classified this work as unskilled and medium exertion. (R. 32). The VE opined that Thomas' work as a school janitor would also be classified as unskilled and medium exertion. (*Id.*). Finally, the VE determined that Thomas' security work for the trucking firm was unskilled and light exertion. (*Id.*).

The ALJ asked the VE to assume "a hypothetical individual closely approaching advanced age with a high school education, the same past relevant work as the claimant, has the residual functional capacity to perform at the light exertional level as that term is defined in the Dictionary of Occupational Titles which does not require climbing ladders, ropes or scaffolds and more than occasional balancing, stooping, kneeling, crouching or crawling. Could such an individual perform past relevant work?" (*Id.*). VE Canutzen responded that such an individual would be able to perform Claimant's past security work but not the other jobs. (R. 33). The ALJ added an additional limitation of jobs that do "not require more than frequent handling or fingering" but the VE's answer remained unchanged, because the security job would require only occasional use of his hands. (*Id.*).

On cross examination, Claimant's attorney asked whether missing work an average of more than two times a month (due to Thomas' gout episodes) would be acceptable for any level of employment. (*Id.*). The VE responded that it would not be acceptable for an unskilled worker to be absent ten percent of the time or twice a month

10

or more. (R. 33-34). Claimant's attorney also asked whether taking extra breaks to lie down, amounting to twenty percent of the workday, would be acceptable to an employer. (R. 34). VE Canutzen again responded that Thomas would not be employable if he were unable to sustain a workday or workweek. (*Id.*). The VE stated that if Thomas has to recline or take naps, or if he has poor concentration, he would not be employable. (*Id.*).

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to

11

trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) *(quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

      **B.**     **Analysis under the Social Security Act**

In order to qualify for SSI or DIB, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

Here, ALJ Gildea employed the five-step analysis in reaching his decision to deny Thomas' request for benefits. (R. 47-52). At step one, the ALJ found that Thomas "has not engaged in substantial gainful activity since March 3, 2005, the alleged onset date." (R. 47). At step two, ALJ Gildea determined that Thomas has the severe impairments of liver disease, rheumatoid arthritis, gout and hypertension. (*Id.*). At step three, the ALJ

12

found that Thomas "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*). He evaluated each of Thomas' impairments (hypertension, arthritis, gout, and liver disease) in the context of an identified listing. (R. 48-49). Based on the findings in Thomas' lab tests and medical records, the ALJ found that none of his impairments meets or medically equals the listed impairments. (*Id.*).

At step four, the ALJ examined Thomas' residual functional capacity ("RFC") in order to determine whether he could perform his past relevant work. (R. 49-52). He found that Thomas has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that he should avoid climbing ladders, ropes, or scaffolds. (R. 49). He also found that Thomas should be limited to occasional climbing of ramps and stairs, and occasional balancing, stooping, kneeling, crouching, or crawling. (*Id.*). The ALJ ultimately concluded that there is no convincing evidence that Thomas has been more limited than the RFC to perform light work for a period of 12 months or more since March 2005. (R. 51). Based on this determination, ALJ Gildea found that Claimant "is capable of performing past relevant work as a security guard and other past work performed at the light exertional level." (R. 52). The ALJ concluded that "this work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965)." (*Id.*).

Because the ALJ found that Thomas is able to perform his past relevant work, his sequential evaluation of Thomas' claim ended at step four. Accordingly, the ALJ determined that Claimant "has not been under a disability, as defined in the Social Security Act, from March 3, 2005 through the date of this decision." (*Id.*).

Thomas argues that the underlying rationale for ALJ Gildea's credibility determination was illogical and requires remand. Thomas also argues that the ALJ erred by making an improper independent medical determination. In addition, Thomas contends that the ALJ's RFC assessment was contrary to Social Security Ruling 96-8p.

### C. The ALJ Failed To Build An Accurate And Logical Bridge From The Evidence To His Conclusion That Claimant Was Not Entirely Credible.

The record contains evidence that supports Claimant's allegations of physical limitations due to gout and rheumatoid arthritis - namely, Claimant's testimony and the fact that he was prescribed several different medications to relieve pain caused by these impairments on multiple occasions. (R. 24-29,199-201). However, because the functionally limiting effects of Claimant's symptoms are not entirely substantiated by objective medical evidence, ALJ Gildea was required to make a credibility finding.

Claimant contends that the ALJ's credibility determination was illogical and that the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion that Claimant was not entirely credible. To succeed on this ground, Claimant must overcome the highly deferential standard that we accord to the ALJ's credibility determination. Because the ALJ is in a far superior position to assess the credibility of a witness, we will only reverse if it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, the ALJ must abide by the requirements of Social Security Ruling 96-7p in evaluating the credibility of statements supporting a Social Security application. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Under SSR 96-7p, "the ALJ's assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his ability to function must be

based on a consideration of all the evidence in the case record," including "medical signs and laboratory findings." SSR 96-7p.

Here, the ALJ's credibility determination is flawed for a number of reasons. The ALJ found that Claimant's statements "concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent that they are inconsistent with the residual functional capacity assessment for the reasons explained below." (R. 50). The ALJ then explained his residual functional capacity ("RFC") assessment. (R. 50-52). However, it is not entirely clear from the ALJ's opinion which bases for his RFC finding the ALJ also intended to support his credibility finding. Accordingly, it is difficult, if not impossible, to trace the path of the ALJ's reasoning with respect to his credibility determination.

The ALJ also found that Claimant had "reversible health problems" caused by excess alcohol consumption and poor nutrition. (R. 51).[3] He did not specify which of Claimant's impairments he considered to be reversible. The ALJ relied on the opinion of Dr. Glenn, a state agency physician who never examined Thomas, to support his conclusion that Claimant experiences reversible health problems. (*Id.*). But Dr. Glenn did not state that all of Claimant's medical impairments would improve if Claimant

---

[3] The ALJ also found that Claimant's testimony that he stopped drinking in November 2007 conflicted with subsequent medical records, which reflected negatively on his credibility. While this is a sound basis to question or reject Claimant's credibility, remand is still appropriate because the multiple flaws discussed in this section are not harmless error. *Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006) (stating that "the only situations in which an error in the factors considered by the trier of fact in making a credibility determination can confidently be thought harmless are when a contrary determination would have to be set aside as incredible or when the trier of fact says that he would have made the same determination even if the questioned circumstances had been different from what he thought them to be and he gives an adequate reason for that back-up position.")

stopped drinking and/or improved his nutrition. (R. 188). Instead, Dr. Glenn merely listed a few of Claimant's conditions and stated that "above *should* improve with TX." (*Id.*) (emphasis added). The ALJ found Dr. Glenn's opinion to be well reasoned and consistent with the record as a whole and therefore, gave it significant weight. (R. 51). However, Dr. Glenn's opinion, which is limited to a few shorthand notes, contains no reasoning at all. (R. 188). Moreover, it is not clear to this Court how refraining from alcohol or improving one's nutrition might affect a condition such as rheumatoid arthritis. Again, we cannot trace the path of the ALJ's reasoning and we cannot say he built an accurate and logical bridge from the evidence to his conclusion that Claimant's impairments were reversible.

Next, in discussing Claimant's rheumatoid arthritis and gout, the ALJ found that the fact that Claimant's doctor did not place any limits on his activities suggests that Claimant does not have any severe limitations. (R. 50). The ALJ's finding in this regard is based on a discharge summary from Oak Forest Hospital. Claimant's physician did not place any restrictions on his physical activities. (*Id.*). Rather, the discharge summary states Claimant's physical activities should be "as tolerated." (*Id.*). It is troubling that the ALJ would rely on a discharge summary relating to an admission for gastritis, alcoholic liver disease, and alcohol withdrawal to support a conclusion that Claimant has no severe limitations resulting from his rheumatoid arthritis or gout. Claimant was not admitted for complications resulting from his rheumatoid arthritis or gout. Accordingly, it is not surprising that the discharge summary does not include limitations on Claimant's physical activities resulting from those impairments. Furthermore, the ALJ ignores the fact that Claimant was repeatedly prescribed

16

medication to address pain and swelling resulting from his arthritis. (R. 199-201). Again, the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion.

The ALJ also found Thomas not entirely credible based in part on Claimant's prior work history which "demonstrates that for many years prior to his alleged onset of disability he performed work at the light and medium levels of exertion." (R. 50). The ALJ concluded that Claimant's lengthy work history is not necessarily consistent with his allegations of disability.[4] (*Id.*). At the same time, the ALJ also discredited Claimant based on the fact that his work history is characterized by breaks in reported income as well as minimal income. (R. 50-51). On the one hand, the ALJ found that Claimant worked too much at the light and medium levels of exertion and on the other hand, he found that Claimant worked too little. While a spotty work record is an appropriate consideration in a credibility determination, we are troubled by the fact that the ALJ faulted Claimant for working too much in light of his alleged disability and too little. The ALJ failed to explain this inconsistency and we cannot trace the path of the ALJ's reasoning with respect to his opinions concerning Claimant's work history.

Based on the foregoing, we find that the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion that Claimant was not entirely credible. Consequently, the ALJ's credibility finding is not supported by substantial evidence and remand is warranted. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency ... if, while there is enough

---

[4] We note that the ALJ's opinion actually says Claimant's "longitudinal *medical* history is not necessarily consistent with his allegations of disability." This makes no sense. A lengthy medical history would seem to support Claimant's allegations of disability. Moreover, the ALJ was discussing Claimant's work history in the paragraph at issue. Thus, it appears that the ALJ meant Claimant's work history is not consistent with his allegations of disability.

17

evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").

> D. **The ALJ Failed To Build An Accurate And Logical Bridge From The Evidence To His Conclusion That Claimant Had The RFC To Perform Light Work.**

In discussing Claimant's RFC assessment, the ALJ recognized that Thomas had been diagnosed with gout and rheumatoid arthritis based on laboratory testing which showed positive RA titer and an elevated sedimentation rate. (R. 50). However, ALJ Gildea concluded that "the fact that there is no medical imaging tests that demonstrate significant joint abnormalities suggests that the arthritis and gout are most likely mild, if it is there at all". (*Id.*). Claimant contends that the ALJ improperly questioned the basis of Claimant's treating physicians' diagnoses and independently determined, without testimony of a medical expert, that Claimant's gout and rheumatoid arthritis were mild. We agree.

In determining a claimant's RFC, the ALJ may not "play doctor" and make his own independent medical findings. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996). That is precisely what the ALJ did here. Despite recognizing that Claimant was diagnosed with rheumatoid arthritis and gout and that these diagnoses were supported by laboratory findings, without the testimony of a medical expert, the ALJ found that these medical impairments were mild and went so far as to question whether they existed at all. (R. 50). The ALJ based his finding in this regard, at least in part, on the fact that there were no medical imaging tests showing joint abnormalities. (*Id.*). But Claimant was not required to produce medical imaging tests, particularly because the listing under which rheumatoid arthritis is to be evaluated does not require such tests. See 20 C.F.R.

18

404, Subpart P, Appendix 1 (Listing 14.09).[5]

Claimant's diagnoses of gout and rheumatoid arthritis were supported by laboratory findings and Claimant was prescribed medication for pain and swelling caused by these impairments on a number of occasions. (R. 192, 199-201). The ALJ's finding with respect to the severity of Claimant's gout and rheumatoid arthritis constitutes an improper independent medical finding. In addition, we find that the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion that Claimant's gout and rheumatoid arthritis were mild. As a result, the ALJ's RFC finding is not supported by substantial evidence and remand is warranted. *Sarchet*, 78 F.3d at 307. The ALJ must reassess Claimant's RFC on remand.

Claimant also contends that the ALJ's RFC assessment failed to comply with Social Security Rule 96-8p because the ALJ failed to discuss why Claimant's reported symptom-related functional limitations (*i.e.*, those limitations relating to Claimant's ability to stand, walk, and/or use his hands) could or could not reasonably be accepted as consistent with the medical and other evidence. SSR 96-8p. Here, the ALJ found that Claimant's described limited daily activities could not be objectively verified. (R. 51). The ALJ also stated that even if Claimant's activities are truly as limited as alleged, it is

---

[5] At Step 3, the ALJ analyzed Claimant's gout and rheumatoid arthritis under Listing 1.02. Claimant argues that his rheumatoid arthritis should have been analyzed under Listing 14.09. We agree. However, we need not remand on this basis because the record fails to show that Claimant suffered from persistent inflammation or deformity in one major peripheral weight-bearing joint resulting in the inability to ambulate effectively or one major peripheral in each upper extremity resulting in the inability to perform fine and gross motor movements effectively. Nor does the record show that Claimant suffered from ankylosis of his cervical or dorsolumbar spine. See 20 C.F.R. 404, Subpart P, Appendix 1. Accordingly, Claimant did not meet his burden to demonstrate his condition met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

difficult to attribute that degree of limitation to Thomas' medical condition, "in view of the relatively weak medical evidence and other factors discussed in this decision." (*Id.*). We find that the ALJ did discuss why Claimant's alleged symptom-related functional limitations could not reasonably be accepted as consistent with the medical and other evidence. That being said, the ALJ's RFC analysis was clearly influenced by his credibility determination, which as discussed above, is not supported by substantial evidence. Accordingly, for this additional reason, the ALJ must reassess Claimant's RFC on remand.

## III. CONCLUSION

For the reasons set forth above, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

                                           **ENTERED:**

                                           **MICHAEL T. MASON**
                                           **United States Magistrate Judge**

**Dated: May 25, 2011**